**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

            Plaintiff,

            v.

ALEXANDER FISHENKO, et al.,

            Defendants.

Case No.: 1:12-cr-00626-SJ

---

## DEFENDANT ANASTASIA DIATLOVA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL

      Defendant Anastasia Diatlova respectfully submits this memorandum of law in support of her motion pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure for a judgment of acquittal on all counts of the Indictment.[1]

## INTRODUCTION

      With the government's case-in-chief complete, it is clear that, despite having called thirty witnesses and submitting close to 1,000 exhibits, the government has failed to present sufficient evidence from which a rational trier of fact could find that the essential elements of any of the crimes with which Ms. Diatlova has been charged have been established beyond a reasonable doubt. Accordingly, Ms. Diatlova is entitled to a judgment of acquittal on all counts of the Indictment.

      First, Ms. Diatlova is entitled to a judgment of acquittal on Count Eight, which charges her with violating the International Emergency Economic Powers Act ("IEEPA"), because the

---

[1] The Government has filed an Indictment that has been redacted for trial. Citations to the "Indictment" refer to that document.

government has presented no evidence that Ms. Diatlova had any knowledge of the classification of the part at issue.  Therefore, no rational trier of fact could conclude beyond a reasonable doubt that she knowingly and willfully exported part number AS8SLC512K32Q-10L/883C without first obtaining a license in violation of the law.

Second, the government's evidence on the conspiracy count is insufficient to sustain a conviction because the government failed to offer sufficient evidence that Ms. Diatlova knowingly and willfully joined the alleged conspiracy or had any awareness of its goals.  The government has not established that Ms. Diatlova was aware of any attempted violations of the export control laws.  Moreover, the testimony of the government's own witnesses demonstrates that her purported misrepresentations regarding end users had nothing to do with export control violations because none of the parts in those transactions required a license for export to Russia. Nor were the requests by some vendors for end use information required by law – rather, the government's own witnesses testified that this practice was an internal policy followed by certain distributors.  Accordingly, Ms. Diatlova is entitled to a judgment of acquittal on Count One.

Third, the government has failed to introduce evidence that the alleged victims of the wire fraud scheme – here, the U.S. distributors and manufacturers – were deprived of any money or property within the meaning of the Wire Fraud statute or that the defendants ever intended to do so.

Fourth, the government has failed to meet its burden of presenting evidence sufficient to establish venue in the Eastern District of New York for Count One and Count Eight. Those counts must therefore be dismissed.

Because the government has failed to present sufficient evidence from which a rational trier of fact could find each of the required elements for each count charged beyond a reasonable doubt, Ms. Diatlova's motion for a judgment of acquittal should be granted on all counts.

Finally, if the Court denies Ms. Diatlova's motion or reserves judgment until after the jury verdict, we ask that the Court not instruct the jury on a conscious avoidance theory because the government failed to establish a factual predicate for conscious avoidance.

## ARGUMENT

## I.   LEGAL STANDARD

Federal Rule of Criminal Procedure 29 requires a court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In a sufficiency-of-the-evidence challenge, "the evidence [should] be viewed in the light most favorable to the government and all permissible inferences drawn in its favor." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). "Nonetheless, a conviction based on speculation and surmise alone cannot stand." *Id.* "In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks and citation omitted). Furthermore, where a fact to be proved is also an element of the offense, "it is not enough that the inferences in the government's favor are permissible." *See United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

In this case, this standard must be applied in light of the Second Circuit's warning that "[c]onspiracy-to-defraud prosecutions are 'scrutinized carefully,'" *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977) (quoting *Dennis v. United States*, 384 U.S. 855, 860 (1966)), as "courts must be alert to subtle 'attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions.'" *Id.* (quoting *Grunewald v. United States*, 353 U.S. 391, 404 (1957)).  With that caution in mind, and under the applicable legal standards, a judgment of acquittal is required.

## II. MS. DIATLOVA IS ENTITLED TO A JUDGMENT OF ACQUITTAL AS TO COUNT EIGHT

The government has failed to offer evidence sufficient to sustain a conviction against Ms. Diatlova under Count Eight of the Indictment.  Count Eight charges that, on or about February 23, 2012, defendant Alexander Posobilov and Ms. Diatlova, together with others, knowingly, intentionally and willfully exported a Micross static random access memory chip, part number AS8SLC512K32Q-10L/883C from the United States to Russia without first having obtained the required licenses from the Department of Commerce ("DOC").  Indictment ¶ 18.

In order to find Ms. Diatlova guilty of this Count beyond a reasonable doubt, the government must prove that: (1) Ms. Diatlova exported, caused the export, or aided and abetted the export of, an item from the United States; (2) the item required a license for export under the Export Administration Regulations; (3) she failed to obtain a license or other authorization from the U.S. Department of Commerce prior to exporting the items; and (4) she did so knowingly and willfully.  As a matter of law, the government has failed to prove the last of these elements beyond a reasonable doubt.

The government has failed to offer any proof that Ms. Diatlova's actions were knowing or willful because it has not offered any evidence that she was informed of the ECCN for part

number AS8SLC512K32Q-10L/883C prior to exporting it on February 23, 2012.  Indeed, the government's evidence establishes precisely the opposite: although Ms. Diatlova asked the vendor to provide her with the ECCN for the part, the government has presented no email, recorded conversation, or document of any kind indicating that she was ever given that information. *See* GX 15-A; 15-A-a1.  More importantly, the government's evidence shows that defendant Alexander Posobilov had this information and failed to convey it to Ms. Diatlova.  *See* GX 14-F.  The government nonetheless ignored this critical fact on direct examination.  Tr. at 1641:24-1642:11.

In fact, the government's own witness, FBI intelligence analyst Richard Garodnick, admitted on cross examination that, despite having evaluated all of the evidence against Ms. Diatlova in this case, and in particular with respect to Count Eight, he was unaware of a single piece of evidence that would show that she knew the ECCN of the part prior to its export on February 23, 2012:

> MR. FODEMAN: I want to focus your attention to February 23rd, 2012. That is the date that Ms. Diatlova supposedly committed a crime that's charged in Count Eight, correct?
>
> MR. GARODNICK: Yes.
>
> MR. FODEMAN: February 23rd, 2012. Are you aware of any E-mail in which she is told that the ECCN number is 3A001.a.2.c?
>
> MR. GARODNICK: No.
>
> MR. FODEMAN: Zero, zero E-mails?
>
> MR. GARODNICK: Right.
>
> MR. FODEMAN: Are you aware of any recorded telephone call in which Ms. Diatlova is told that the ECCN number for that part with which she's been charged was ECCN 3A001.a.2.c?
>
> MR. GARODNICK: No.

MR. FODEMAN: Are you aware of any consensual recording where Ms. Diatlova was told the ECCN number for the part in which she stands accused?

MR. GARODNICK: No.

MR. FODEMAN: Are you aware of any trash or any evidence at all that shows that Ms. Diatlova was aware of what the ECCN number was for that part on February 23rd, 2012?

MR. GARODNICK: I believe, correct me, if I'm wrong, one of the late 14 exhibits that we went through showed the packing list for All Tech.

MR. FODEMAN: I'm not talking about – oh, packing list?

MR. GARODNICK: Yes.

MR. FODEMAN: That was from April, sir.

MR. GARODNICK: Well, the actual packing list was dated February.

MR. FODEMAN: Did you have any evidence whatever that Ms. Diatlova had that packing list on February 23rd, that she had it, she?

MR. GARODNICK: No. Before February 23rd, no.

Tr. 1651:9 – 1652:14.

For those reasons, the government has failed to make the basic legal and factual showings necessary to prove beyond a reasonable doubt that Ms. Diatlova is guilty of the conduct charged in Count Eight, and she is entitled to a judgment of acquittal.[2]

---

[2] It is our understanding that, after considering the submissions of the parties, the Court has declined to issue an instruction on conscious avoidance. This is proper because the government cannot cure its evidentiary insufficiency by proceeding on a conscious avoidance theory – it has submitted zero evidence that Ms. Diatlova took any deliberate step to consciously avoid learning the ECCN for the part she is charged with exporting, and therefore it has not established the necessary factual predicate to trigger such a charge. In *Global-Tech Appliances, Inc. v. SEB, S.A.*, the Supreme Court held that, in order for conscious avoidance to apply, "(1) the defendant

## III.   MS. DIATLOVA IS ENTITLED TO A JUDGMENT OF ACQUITTAL AS TO COUNT ONE

The government has also failed to offer evidence sufficient to sustain a conviction of

Count One of the Indictment, which charges:

> On or about and between October 1, 2008 and September 28, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SHAVKAT ABDULLAEV, also known as "Stan," ANASTASIA DIATLOVA, also known as "Anna," and ALEXANDER POSOBILOV, also known as "Sasha," together with others, did knowingly and intentionally conspire to: a) willfully export from the United States to Russia items under the jurisdiction of the DOC, to wit: microelectronics, without first having obtained the required licenses from the DOC; b) willfully export from the United States to Russia items designated as defense articles on the United States Munitions List ("USML"), to wit: microelectronics, without first obtaining the required licenses or written approval from the State Department; and c) devise a scheme and artifice to defraud, and obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals and sounds, to wit: email communications containing false information regarding ARC's export function and false end user and end use information.

---

must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." 563 U.S. 754, [2070] (2011) (citations omitted).  Therefore, the standard for conscious avoidance surpasses not only negligence, foolishness, and mistake, but also surpasses a showing of recklessness. *Id.* (". . . a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing.") (citations omitted).  If the prerequisites of a conscious avoidance instruction are not satisfied, there is a risk that "a jury could be given a conscious avoidance instruction in a case where there was only equivocal evidence that the defendant had actual knowledge and where there was no evidence that the defendant deliberately avoided learning the truth.  Under those circumstances, a jury might conclude that no actual knowledge existed but might nonetheless convict, if it believed that the defendant had not tried hard enough to learn the truth." *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000).  The government has not offered any evidence that Ms. Diatlova took steps to avoid learning the part's ECCN – instead, it has shown that she took multiple steps to obtain that information and it was never given to her.

Indictment ¶ 15.

In order to find Ms. Diatlova guilty of this Count beyond a reasonable doubt, the government must prove that:  (1) two or more persons entered into an unlawful agreement; (2) Ms. Diatlova knowingly and willfully became a member of the conspiracy; (3) at some time during the existence of the agreement or conspiracy, at least one of its members performed at least one of the overt acts charged in the Indictment; and (4) the overt act was committed to further some objective of the conspiracy.  The government has failed to introduce evidence that Ms. Diatlova had knowledge of any of the three objects of the alleged conspiracy and therefore no reasonable trier of fact could conclude beyond a reasonable doubt that she knowingly and willfully joined the alleged conspiracy.

A.     **Ms. Diatlova is Entitled to a Judgment of Acquittal as to the Export Control Object of the Conspiracy**

The government has failed to present evidence sufficient to show that Ms. Diatlova believed that any of the transactions in which the government alleges that she provided false end user information to U.S. distributors were connected to a scheme to violate the export control laws.  First, the government has provided no evidence regarding whether the parts at issue in those transactions required a license for export to Russia, and in fact, none of them did. Therefore, even if Ms. Diatlova did provide false end user information in connection with those transactions – something the government has not shown – it had no bearing on whether those parts were exportable.  All of the parts were exportable to civil end users in Russia without a

8

license.  Indeed, Intelligence Analyst Julie Jordan repeatedly admitted as much during cross examination.  *See* Jordan testimony Oct. 19, 2015.[3]

As numerous government witnesses testified, obtaining end user information was not a legal requirement for export control.  Instead, the practice was an internal corporate policy of some of the distributors and manufacturers with which ARC did business.  As Brian Baker, Director of the Materials and Electronics Division at the Bureau of Industry and Security, testified, there is no requirement in the EAR that a vendor obtain end use information before completing a sale to an exporter. Tr. 753:1-13.  Moreover, Joseph Kim, Senior Director for Global Trade Compliance of Xilinx, Inc., testified that end user statements are an internal practice of his company, and are not required by law.  *See* Tr. 935:18 – 936:4.  As Julius Christensen, Senior Vice President and General Counsel of Toshiba America Electronic Components, Inc. ("TAEC"), testified:

> MR. FODEMAN: Okay. And I think you told us, and I don't want to misquote exactly what you said, but I think you said that you try to get end user statements if you can; is that correct?
>
> MR. CHRISTENSEN: We try to find out what the end use and what the end user are, and we try to learn that through our customer.
>
> MR. FODEMAN: And you're doing that as a matter of corporate responsibility, corporate policy; is that correct?
>
> MR. CHRISTENSEN: Yes. We have an export control program that requires us to do that, and programs designed to comply with the law.
>
> MR. FODEMAN: Got it. And you're familiar with EAR99 parts; is that correct? Do you know what that term means?

---

[3] As of the filing of this motion, the transcript of Analyst Jordan's testimony is not yet available.

MR. CHRISTENSEN: I do generally.

MR. FODEMAN: Do you seek to get end use statements and end user statements with regard to those parts when those are being sold?

MR. CHRISTENSEN: We do try to find out what the end use and what the end user are. I wouldn't say end use statements, but we do try to screen where the product is going and who is going to use it.

MR. FODEMAN: Okay. And, again, that's not because the law demands you do that, that's just being essentially extra careful of where you want your parts to end up; is that fair?

MR. CHRISTENSEN: We have a very conservative robust export control policy that is designed to comply with both the US law and Japanese law; and so, yes, it's more restrictive than either of those two.

MR. FODEMAN: By this you mean your own –

MR. CHRISTENSEN: Our, TAEC's internal policy, yes.

Tr. 1170:19-1171:22. This same point was made by Terry Borges, of Hittite Microwave Corporation. *See* Tr. 1949:19 – 1950:1.

Because the government has presented no evidence that end user statements were legally required in order to comply with the export control laws, and has presented no evidence regarding the actual end users for the transactions in which it alleges that Ms. Diatlova supplied false end use information to distributors, the government is therefore unable to show that Ms. Diatlova had knowledge of the export control object of the alleged conspiracy. Because it is impossible for Ms. Diatlova to have knowingly and willfully joined a scheme she did not know existed, she is entitled to a judgment of acquittal in connection with that part of Count One.

**B.    Ms. Diatlova is Entitled to a Judgment of Acquittal as to the Wire Fraud Object of the Conspiracy**

**1.   Overview of Wire Fraud**

Because the government cannot show that Ms. Diatlova's provision of allegedly false end user information had anything to do with violating the export control laws, it falls back on an alternative object of the conspiracy – wire fraud.  However, the government has also failed to present evidence sufficient to prove beyond a reasonable doubt that Ms. Diatlova was aware of the wire fraud object of the conspiracy.

The "essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks and citation omitted).  In the context of wire fraud, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally v. United States*, 483 U.S. 350, 358 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)); *see also id*. at 356 ("Insofar as the sparse legislative history reveals anything, it indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them ***of their money or property***.") (emphasis added).  Satisfying the "scheme to defraud" element requires that the "defendants ***contemplated*** some actual harm or injury to their victims." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (emphasis in original); *see also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180-81 (2d Cir. 1970) ("Proof that someone was actually defrauded is unnecessary simply because the critical element in a 'scheme to defraud' is 'fraudulent intent,' and therefore the accused need not have succeeded in his scheme to be guilty of the crime.  But the purpose of the scheme must be to injure[.]") (internal

quotation marks and citations omitted).  As part of the scheme, "the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck."  *United States v. Kurtz*, No. 04-CR-0155A, 2008 U.S. Dist. LEXIS 32674, at *6 (W.D.N.Y. Apr. 21, 2008).

Thus, in order to prove wire fraud, the government must introduce sufficient evidence that the purported victims of the alleged scheme to defraud – here, the U.S.-based manufacturers and distributors of microelectronics – were deprived of "property" or money.  *See* 18 U.S.C. § 1343; *McNally*, 483 U.S. at 356-58.  The microelectronics themselves cannot, without more, constitute the "property" or thing of value of which the manufacturers and distributors were deprived, because ARC paid them for the microelectronics.  *See Kurtz*, 2008 U.S. Dist. LEXIS 32674, at *7 (explaining that the purchased biological agents "cannot, without more, constitute the 'property' or thing of value of which [the supplier] was deprived" because the supplier sold them); *see also United States v. Bruchhausen*, 977 F.2d 464, 467 (9th Cir. 1992) (explaining that the equipment sold could not constitute the property of which manufacturers were deprived because they received "the full sale price for their products").  Under these circumstances, the government must prove that the manufacturers and distributors were deprived of some property right beyond the actual microelectronics themselves.  *See United States v. Schwartz*, 924 F.2d 410, 420-21 (2d Cir. 1991) (where the seller of night vision goggles was paid for such goods, wire fraud conviction must be supported by deprivation of "property" beyond the goods themselves).

As the Second Circuit explained in *Shellef*, "[o]ur cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid – which do not violate the mail or wire fraud statutes – and schemes that depend for their

completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." 507 F.3d 82, 108 (2d Cir. 2007) (collecting cases).

The government simply cannot show that ARC's vendors were deprived of a property right beyond the goods themselves. The facts of this case are nearly identical to those of *United States v. Bruchhausen*, and judgment of acquittal should be granted for the same reasons the wire fraud conviction was vacated in that case. There, the defendant misrepresented to American technology manufacturers the ultimate destination of the items he purchased, falsely assuring them that the goods would be used in the United States. The defendant's misrepresentations were intended to conceal his scheme to smuggle U.S.-made technology to West Germany and the Soviet Bloc. During the defendant's bench trial for wire fraud, the U.S. manufacturers testified that they "would never have sold to [the defendant] had they known the truth" and "would not have sold the products if they had been told that the products were destined for the Soviet bloc." 977 F.2d at 466-67. The Ninth Circuit considered the question of whether the manufacturers were defrauded of "property" within the meaning of the wire fraud statute, 18 U.S.C. § 1343, and held they were not. *Id.* at 467-68. The Court reversed the defendant's convictions for wire fraud, holding that there was no protectable property interest at issue. *Id.* ("We conclude, therefore, that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not 'property' of the kind that Congress intended to reach in the wire fraud statute."). The Court reasoned that "[t]he manufacturers received the full sale price for their products; they clearly suffered no monetary loss. While they may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products after sale." *Id.* at 467. The Ninth Circuit concluded that while "the manufacturer may have an interest in assuring that its products are not

ultimately shipped in violation of law," such an "interest in the disposition of goods [the manufacturer] no longer owns is not easily characterized as property." *Id.* at 468; *cf. United States v. Evans*, 844 F.2d 36, 42 (2d Cir. 1988) (holding that "the United States's interest in regulating foreign resales of arms is not a property right for wire and mail fraud purposes.").

Likewise, the U.S.-based vendors who are the purported victims of the scheme alleged in this case cannot, as a matter of law, be found to have been deprived of property within the meaning of the wire fraud statute, because their purported desire that their microelectronics not be shipped to Russian end users is not a property interest under that law. *See Bruchhausen*, 977 F.2d at 467-68. Just like the manufacturers in *Bruchhausen*, the distributors in this case no longer owned the microelectronics after they were sold to ARC. Accordingly, for the same reasons, the manufacturers and distributors' post-sale interest with respect to the disposition of the microelectronics is not characterized as property. *See id.*

Perhaps recognizing that there was no deprivation of money or property here, the government has advanced a "no-sale" theory of wire fraud, arguing that Ms. Diatlova and others engaged in a conspiracy to defraud U.S.-based distributors by inducing them to sell microelectronics to ARC that they otherwise would not have sold had they known the true end users of the microelectronics. Such an inducement to make a sale, however, does not constitute a scheme to defraud within the meaning of the wire fraud statute as interpreted by the Second Circuit. *See Shellef*, 507 F.3d at 108; *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *see also Bruchhausen*, 977 F.2d at 467-68. "***[S]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes***[.]" *Shellef*, 507 F.3d at 108 (emphasis added); *see also United States v. $52,037.96 Seized from XXXX3161*, No. 3:14-cv-00591-WWE, 2014 U.S. Dist. LEXIS 178018, at *10-12

14

(D. Conn. Dec. 30, 2014) (dismissing civil asset forfeiture case for failure to indicate how it will establish that the property is traceable to wire fraud where the fraud allegations "rest [solely] on the testimony of the BMW dealership indicating that it would not have entered into the contract had it known that the BMW would be immediately sent overseas for resale").

"Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim." *Starr*, 816 F.2d at 98.  In order to constitute mail or wire fraud, a scheme must "depend for [its] completion on a misrepresentation of an ***essential element*** of the bargain," and there must be a "discrepancy between benefits reasonably anticipated and actual benefits received."  *Shellef*, 507 F.3d at 108 (emphasis added).

To support its theory, the government has advanced a series of misrepresentations, none of which were "essential" to the bargain between the U.S.-based vendors and ARC, and none of which contemplated any harm to those distributors.

## 2. The Alleged Misrepresentations Were Not "Essential Elements of the Bargain"

The alleged misrepresentations revolve around a single issue – the true end-users and end use of the microelectronics and whether ARC intended to resell the products abroad.  The government's only evidence of Ms. Diatlova's alleged misrepresentations in furtherance of the purported conspiracy consists of misrepresentations regarding: (a) certain end-user and end use information and (b) ARC's export function.  Indictment ¶ 15.  Neither the end users nor end use of the microelectronics, nor ARC's export function, were an "essential element of the bargain." Those alleged misrepresentations go to a single issue – who ARC's customers were, or, in some instances, who their customer's customers were.  This was not an "essential element" of the bargain between ARC and its vendors because once the distributors sold their products to ARC

at the agreed-upon prices, they no longer had any property interest in those products. Furthermore, the government has offered no evidence that ARC maintained any contracts with its vendors prohibiting ARC from re-selling their products or guaranteeing resale to a specific end-user.

In general, a buyer's misrepresentations about the identity of the customer to whom it intends to later transfer property does not violate the wire fraud statute because it is not an essential element of the bargain. For example, in *United States v. Kurtz*, the defendant circumvented a supplier's policy of not selling biological materials to private individual purchasers by arranging for the materials to be ordered by an investigator for the University of Pittsburgh's Human Genetics Laboratory who purchased the materials through the University of Pittsburgh's registered account with the supplier. Once the University of Pittsburgh investigator obtained the materials, he provided them to the defendant. The court held that "it is clear that the indictment does not sufficiently allege a 'no-sale' theory of fraud." 2008 U.S. Dist. LEXIS 32674 at *6. It reasoned that "there is ***no allegation that the defendant's scheme depended on a misrepresentation of an essential element of the bargain***," even where "the Material Transfer Agreement which accompanied each shipment provided that the purchaser not transfer the biological materials." *Id.* at *15 (emphasis added).

Similarly, in the recent Second Circuit case of *Shellef*, the defendant misrepresented to the manufacturer of a regulated chemical that he was purchasing the chemical for resale overseas, which was not subject to excise taxes, when in fact he intended to sell it domestically. The indictment alleged that the defendant's misrepresentations induced the manufacturer to sell the chemical to him and that it would not have sold had it known defendant's true intentions. The Second Circuit held that the indictment was insufficient to allege wire fraud because it did

16

not allege "that there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received.'"  507 F.3d at 109 (quoting *Starr*, 816 F.2d at 98).  "Instead, the indictment states only that [the defendant's] misrepresentations induced [the manufacturer] to enter into a transaction it would otherwise have avoided.  Because it does not assert that [the defendant's] misrepresentation had 'relevance to the object of the contract,'" the indictment was held legally insufficient.  *Id.* (quoting *Starr*, 816 F.2d at 100); *cf. United States v. Lebovits*, No. 11-CR-134(SJ), 2012 WL 10181099, at *7 (E.D.N.Y. Nov. 30, 2012) (finding, in response to defendant's argument that the indictment fails to allege wire fraud because the alleged fraud does not concern "an essential element of the bargain," that defendants "may well be in a position to make a compelling motion for a judgment of acquittal" "if the government's proof at trial establishes only that insurance companies would prefer not to issue large, multi-million dollar life insurance policies to lower middle class individuals who plan to sell those policies immediately after obtaining them and have no intention of paying the premiums on the policies themselves, and that the reasons for this preference on the part of insurance companies *have nothing to do with* the risks and rewards, profits and losses, or other terms of the bargain made when an insurer issues a life insurance policy") (emphasis in original), *aff'd sub nom. United States v. Gutwein*, No. 11 CR 134 (SJ), 2014 WL 201500, at *1 (E.D.N.Y. Jan. 16, 2014) (adopting Report and Recommendation).

Several other Second Circuit cases outside of the products context hold that misrepresentations that are not an "essential element of the bargain" and are not directed at the "nature of the bargain" cannot support a wire fraud charge.  *See, e.g.*, *Starr*, 816 F.2d at 100 (concealing high-rate mail in low-rate mail packaging and charging customers for high-rate mailings "ha[d] no relevance to the object of the contract; namely, the delivery of mail to the

appropriate destination in a timely fashion"); *Regent Office Supply Co.*, 421 F.2d at 1179

(directing stationary sales personnel to misrepresent their identities to prospective customers so

that customers would entertain their offers was not essential to the bargain because the

misrepresentations were "not directed to the quality, adequacy or price of goods to be sold, or

otherwise to the nature of the bargain"). Here, the ultimate end user of the microelectronics had

no relevance to the price at which the microelectronics would be sold to ARC or the nature of the

bargain for their sale, and the government's own witnesses have testified to this fact. *See, e.g.*,

Tr. 1446:18-20. The ultimate destination of the microelectronics was not and cannot be termed

an essential element of the bargain. *See Bruchhausen*, 977 F.2d at 467-68 (holding that while

"the manufacturer may have an interest in assuring that its products are not ultimately shipped in

violation of law," it no longer has a property interest in the disposition of goods it no longer

owns). The contracts between ARC and its vendors did not contain any bargained for

restrictions on subsequent sales to third parties.[4]

### 3.   The U.S.-Based Vendors Received Exactly What They Bargained For And Were Not Harmed By The Alleged Misrepresentations

This Circuit has repeatedly held that a wire or mail fraud charge "can not apply to

situations where the alleged victims 'received exactly what they paid for' and 'there was no

discrepancy between benefits reasonably anticipated and actual benefits received.'" *Shellef*, 507

---

[4] By contrast, the Second Circuit explained in *Shellef* that the misrepresentations in *United States v. Schwartz* did go to an "essential element of the bargain" because the vendor sought contractual assurances that the defendants would not export the goods to certain restricted nations, and so the misrepresentations were not merely fraudulent inducements to gain access to the equipment. *Shellef*, 507 F.3d at 108. Because the parts at issue in *Schwartz* were all USML/ITAR parts and were subject to the AECA, they all required licenses for export and accurate end user information was a necessary requirement for obtaining those licenses. By misrepresenting the actual countries of export in violation of its contracts, the Court reasoned that the defendants had deprived the vendor of the right to define the terms for the sale of its property and had cost it good will. *Id*. at 108-09. None of those circumstances existed here.

F.3d at 108 (quoting *Starr*, 816 F.2d at 98-99).  Here the U.S.-based manufacturers and distributors received exactly what they bargained for and the benefits they reasonably anticipated – the sale of microelectronics to ARC at the negotiated prices.  The distributors could not have "reasonably anticipated" that ARC would not transfer the microelectronics in some form to third party end-users, especially in light of the fact that ARC not only did not hide the fact that it was exporting its products to Russia – a fact to which the government's vendor witnesses testified. *See, e.g.*, Tr. 1400:19-21.  The distributors bargained for sales of their microelectronics to ARC at negotiated prices with the expectation that the microelectronics would eventually be transferred to third parties.  The government therefore failed to establish that the alleged misrepresentations of Ms. Diatlova and others affected the essential terms of the contracts between ARC and the manufacturers and distributors.

The government has neither alleged in the Indictment nor has submitted any evidence of any actual or contemplated harm to the U.S.-based vendors who sold microelectronics to ARC. Likewise, the government failed to establish that the alleged misrepresentations affected the ultimate value of the transactions.  *See* Tr. 1446:18-20.

Instead, the government argues that the manufacturers and distributors were harmed because they would not have sold the microelectronics to ARC if they were aware of the true end-users.  But this testimony, even if taken as true, is insufficient to constitute wire fraud under *Shellef* and controlling Second Circuit precedent.  As explained above, it is simply not enough that Ms. Diatlova and others' purported misrepresentations may have induced the distributors to enter into transactions they would have otherwise avoided.  *See Bruchhausen*, 977 F.2d at 467-68; *Kurtz*, 2008 U.S. Dist. LEXIS 32674, at *14-15.  As the Second Circuit has ruled, "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that

the services contracted for were dishonestly completed." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (reversing defendant's conviction for mail fraud because the defendant's conduct did not affect an essential element of the Union contractors' bargains and the contractors received all they bargained for).

Accordingly, Ms. Diatlova is entitled to judgment of acquittal under the wire fraud object of Count One.

## IV.   A JUDGMENT OF ACQUITTAL SHOULD BE GRATNED ON ALL COUNTS BECAUSE THE GOVERNMENT FAILED TO PROVE THAT MS. DIATLOVA ACTED KNOWINGLY AND WITH SPECIFIC INTENT

IEEPA violations and wire fraud are specific intent crimes, and therefore the government must establish that Ms. Diatlova acted knowingly and with a willful intent to defraud or deceive. Because Count One charges Ms. Diatlova with conspiracy to commit IEEPA violations and wire fraud, the government must also prove a specific intent to defraud in order to sustain a conviction on the conspiracy charge. *See United States v. Ceballos*, 340 F. 3d 115, 124 (2d Cir. 2003) (citing *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir.2001)). For the reasons explained above, the government has failed to satisfy this element of the substantive IEEPA count. Nor has the government offered evidence sufficient to prove that Ms. Diatlova participated in the alleged conspiracy for the purpose of financially harming ARC's vendors with the specific intent of obtaining their money or property through deceit. The government's evidence on intent for Counts One and Eight was at least as consistent with innocence as with guilt. Therefore no rational trier of fact could find Ms. Diatlova's intent to violate the export control laws or to defraud beyond a reasonable doubt, and a judgment of acquittal should be granted on all Counts.

## V.      THE GOVERNMENT HAS FAILED TO PROVE VENUE

Finally, the Government has failed to prove venue for the counts with which Ms. Diatlova is charged.  "'[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count.'"  *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004) (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.1989)). "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (citing *United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001); *United States v. Bezmalinovic*, 962 F. Supp. 435, 438 (S.D.N.Y. 1997)).  For a conspiracy charge, venue is proper in "any district in which an overt act in furtherance of the conspiracy was committed by any of the co-conspirators."  *Geibel*, 369 F.3d at 696.

The government has failed to prove venue as to Count Eight.  As the Court is well aware, the alleged crimes at issue occurred in Houston, Texas, and Russia.  ARC was located in Houston, the defendants all lived and worked in Houston, their alleged co-conspirators all lived and worked in either Houston or Russia, and the parts at issue were all purchased, sold, and shipped from Houston.  Indeed, when it comes to Count Eight, the only evidence the government has offered to support the notion that venue is proper in the Eastern District of New York is that the export that is subject of that Count was supposedly routed through John F. Kennedy Airport on its way to delivery in Russia.

While the Second Circuit has found venue to be proper in some cases where conduct committed elsewhere had effects in the district where the case is brought, *see, e.g.*, *Kim*, 246 F.3d at 193 (venue proper in Southern District of New York where defendant approved

fraudulent invoices knowing that the victim paid its vendors from Manhattan banks), to support

venue on this basis it must be ***foreseeable*** to the defendant that she would cause some act to

occur in the Eastern District of New York. *See Svoboda*, 347 F.3d at 483; *Bezmalinovic*, 962 F.

Supp. at 438 (venue improper in bank fraud case because the defendant neither intended nor

could have foreseen that the bank would process parts of the transaction in Manhattan).

Moreover, in a mail fraud case, venue does not lie in districts through which mail is merely

routed before it is ultimately delivered. *United States v. Brennan*, 183 F.3d 139, 146 (2d Cir.

1999) (mail routed through John F. Kennedy or LaGuardia airports insufficient to establish

venue). Instead, venue is proper only in a district where "the defendant 'places,' 'deposits,'

'causes to be deposited,' 'takes,' or 'receives' mail or 'knowingly causes' mail 'to be

delivered.'" *Id*. at 147 (quoting 18 U.S.C. § 1341); *see also, United States v. Ramirez*, 420 F.3d

134, 144-46 (2d Cir. 2005) (venue in New York improper where there was no evidence that

defendant knew false report would be delivered to Manhattan). Because the government's only

alleged evidence linking Count Eight to the Eastern District of New York is the intermediate

routing of mail, this standard should be applied here.

     Not only is the fact that mail was routed through John F. Kennedy airport on its way to

delivery in Russia insufficient to establish venue in this district, Ms. Diatlova had no reason to

foresee that anything she shipped to Russia from Houston would first come in contact with the

Eastern District of New York. All of her actions occurred in Texas. To her knowledge, her

customers were receiving the parts in Russia. The government has submitted no evidence that

Ms. Diatlova had any knowledge of the shipping routes or practices of international freight

forwarders, nor has it shown that she would have any reason to know of those practices. Ms.

Diatlova therefore could not have foreseen that a product she sold in Houston to a customer in

Russia would first pass through the Eastern District of New York.  Ms. Diatlova did not send the parts to New York.  That was a decision made by the shipping company utilized by ARC, not a co-conspirator.

The government has therefore submitted no evidence that venue properly lies in the Eastern District of New York, and Count Eight should be dismissed as to Ms. Diatlova. Moreover, the one act that the government alleges ties the conspiracy count to the Eastern District of New York is an alleged misrepresentation made by Ms. Diatlova to a vendor with headquarters in Brooklyn.  However, for the reasons explained above, that alleged misrepresentation was not illegal, was not an overt act in furtherance of the conspiracy, and therefore is irrelevant to the venue analysis. Accordingly, the government has failed to present evidence that an overt act in furtherance of the conspiracy occurred in the Eastern District of New York and Count One should be dismissed.

## CONCLUSION

For the foregoing reasons and the reasons stated on the record, a judgment of acquittal should be granted on all counts and the case against Ms. Diatlova should be dismissed in its entirety.

Dated:  October 19, 2015

Respectfully submitted,

s/ Morris J. Fodeman
   Morris J. Fodeman

Morris J. Fodeman
Megan E. Wall-Wolff
WILSON SONSINI GOODRICH
& ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Tel.: (212) 999-5800

Fax: (212) 999-5899

*Attorneys for Defendant Anastasia Diatlova*