UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,          :

    -against-                                          :        12 CR 626 (SJ)

SHAVKAT ABDULLAEV,                       :

    Defendant.                                         :
-------------------------------------------------------x

## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT SHAVKAT ABDULLAEV

Dated: New York, New York
       November 2, 2016

Respectfully submitted,

**RICHARD B. LIND, ESQ.**
880 Third Avenue, 13th Floor
New York, NY 10022
*Attorney for Defendant*
*Shavkat Abdullaev*

## RICHARD B. LIND
ATTORNEY AT LAW
880 THIRD AVENUE
13TH FLOOR
NEW YORK, N.Y. 10022

TELEPHONE (212) 888-7725
FACSIMILE (212) 371-2961
E-MAIL: rlind@lindlawyer.com
WEBSITE: www.richardlindlawyer.com

November 2, 2016

*Via ECF and FedEx*
Hon. Sterling Johnson, Jr.
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: United States v. Shavkat Abdullaev
      12 CR 626 (SJ)

Dear Judge Johnson:

  This letter is submitted on behalf of defendant Shavkat Abdullaev (Shavkat"), who is scheduled to be sentenced by this Court on November 9, 2016. For the reasons articulated herein, Shavkat should be sentenced to time already served in prison.

## BACKGROUND

### A. Charges and Convictions

  As the presentence investigation report (the "PSR") states, on October 26, 2015, Shavkat was found guilty by jury trial of Counts 1(a) and (c), 5, 6, and 7 of the redacted trial Indictment. Count 1(a) charged that between October 2008 and September 28, 2012, Shavkat and co-defendants Anastasia Diatlova and Alexander Posobilov and others conspired to (a) willfully export from the United States to Russia microelectronics under the jurisdiction of the United States Department of Commerce ("DOC"), without first having obtained the required licenses from the DOC, contrary to 50 U.S.C. §§ 1702 and 1705; and (c) commit wire fraud via email communications containing false information regarding ARC Electronics' export function and false end user and end use information contrary to 13 US.C. § 1343, in violation of 18 U.S.C. § 371. PSR, ¶ 1.

  Counts 5, 6, and 7 of the Indictment charged that on June 30, July 13, and July 27, 2011, respectively, Posobilov and Shavkat exported microelectronics under the jurisdiction of the DOC from the United States to Russia, without first having obtained the required licenses from the DOC, in violation of 50 U.S.C. §§ 1702 and 1705. Shavkat was found not guilty of Count 1(b). PSR, ¶¶ 2-5.

### B. The PSR's Account of Shavkat's Alleged Conduct and Role in The Offense

The PSR states that Shavkat was a "contract administrator," i.e., a salesperson, at ARC Electronics, Inc. ("ARC") from January 2008 to November 2009, and then later became a shipping manager at ARC in June 2011 until ARC was shut down by the government in late September 2012. The PSR alleges that during the second time frame, among other tasks, Shavkat submitted paperwork under the Automated Export System ("AES") to Government agencies. PSR, ¶¶ 8-9. The PSR further alleges that Shavkat shipped items to Russia without the required licenses. As support for this assertion, the PSR states that ARC's *warehouse "received* 59 shipping notices from the distributor Avnet reflecting that ARC was purchasing 3A001 controlled products, but [Shavkat] consistently indicated in shipping paperwork that these products were EAR99 [not requiring an export license], which could be exported to Russia." PSR, ¶¶ 17, 22 (emphasis added). The trial testimony makes clear, however, that the government failed to establish that the shipping notices *received* from Avnet were opened by Shavkat. Tr. 1676-79. In addition, the PSR clearly recognizes that "[w]hile Abdullaev was a shipping manager at ARC, he did not hold a supervisory or managerial role in respect to the instant offense." PSR, ¶ 22.

Moreover, the PSR ignores that, according to the Indictment itself, Shavkat's alleged criminal conduct spanned less than a month -- i.e., from June 30, 2011 to July 27, 2011. Further, the PSR neglects to mention that during most of the pertinent time period, the contract administrators, not Shavkat, were responsible for determining and indeed highlighting when a microelectronic part destined for shipment to Russia required an export license.

### C. Shavkat's Personal History

Shavkat was born on July 16, 1978, in Bukhara, Uzbekistan, to the marriage of Ibragim Abdullaev and Munnavar Abdullaev. His parents separated sometime between 2003 and 2006, for reasons unknown to him. The father, a retired police officer, supports himself with pension benefits; Shavkat maintains a good relationship with his father, who is in good health. Shavkat's mother formerly resided in Uzbekistan and previously worked as a human resources manager. She receives a pension. She was recently granted U.S. Permanent Resident Alien status and lives with Shavkat's sister in Brooklyn. She also is supportive of Shavkat. PSR, ¶¶ 91-92. Shavkat has a sister, Dilradio Abdullaev, and a brother Shukrat Abdullaev. She is a homemaker with two children and resides in Brooklyn. He is a student at Bukhara University. Stan maintains a good relationship with both of his siblings. PSR, ¶ 93.

Shavkat and his siblings were raised by their parents in an intact, middle-income household in Bukhara. As described by Shavkat, his childhood was "happy." Shavkat graduated from high school in Bukhara in 1995, with average grades and achievements in basketball and boxing. From 1996 to 2000, Shavkat attended Bukhara State University in

2

RICHARD B. LIND

Uzbekistan. His major was English. He remained in the parental home until 2000, when he legally immigrated to the United States. He is a legal U.S. Permanent Resident Alien. While in this country, Shavkat has resided -- in sequence -- in Brooklyn, New Jersey, Philadelphia, Houston, again in Brooklyn, and Wilmington, Delaware. PSR, ¶¶ 94,105-06.

From 2001 to 2004, Shavkat maintained a relationship with Lola Gulyamova which produced their son [REDACTED].[1] Their relationship ended as their personalities clashed. Shavkat was arrested in South River, New Jersey, in 2003, after fighting with her. She resides in Brooklyn, and her employment status is unknown, as she has had minimal contact with him in the past ten years. PSR, ¶ 95.

As described in the PSR, [REDACTED] is a healthy sixth-grade student who resides with Shavkat in Delaware. Shavkat was granted full custody of [REDACTED] in Kings County Family Court several years ago, when Ms. Gulyamova did not appear for scheduled Family Court custody hearing. She does not pay child support and irregularly visits their child. Shavkat related to the Probation Officer that "since [REDACTED] is unfamiliar with Ms. Gulyamova, if [Shavkat] were to be sentenced to a period of incarceration, the defendant's mother, sister and ex-wife have agreed to care for [REDACTED]." PSR, ¶ 96. [REDACTED] did live with Shavkat's mother in Uzbekistan from 2010 to 2014. Since then, [REDACTED] has "resided with [Shavkat], *and they share a close relationship.*" *Id.* (emphasis added); *see also* PSR, ¶ 99.

In January 2005, Shavkat married Tara Abdullaev (nee Thomas), an Afro-American woman, in Las Vegas, Nevada. A recent picture of Shavkat together with Tara is annexed hereto as Exhibit B. They separated and divorced in approximately 2009 or 2010. Tara resides in Wilmington, Delaware and is a chemical engineer with a major United States company.[2] The marriage produced one daughter, [REDACTED] (age 9), who is a healthy third-grade student. Significantly, Shavkat "*maintains daily contact with his ex-wife and daughter, and brings the daughter to school on a daily basis.*" PSR, ¶ 97 (emphasis added). Under the terms of the divorce agreement, Shavkat is not required to pay financial support for his daughter.[3]

During a telephone interview with the Probation Officer, Tara described Shavkat as a "kind-hearted individual, who has been a good father to their daughter. While the defendant does not provide monetary child support, *he has been emotionally supportive and has participated in caring for [their] daughter*. The ex-wife noted that she *trusts the defendant with their daughter*. Regarding the instant offense, [Tara] believes that [Shavkat] became involved due to ignorance. She noted that he may not have been properly trained, and *most likely followed the directives of his superiors*." PSR, ¶ 98 (emphasis added).

---

[1] A recent photo of Shavkat with his son [REDACTED] and his daughter [REDACTED] (described below) is annexed hereto as Exhibit A.
[2] A recent photo of Shavkat and [REDACTED] is annexed hereto as Exhibit C.
[3] Shavkat is the father of a third child, [REDACTED] (age 17 or 18), who resides in Uzbekistan with his mother; Shavkat maintains contact with [REDACTED]. PSR, ¶ 98.

3

### D. Shavkat's Employment Record

As recounted in the PSR, ¶¶ 109-113, Shavkat has had varied employment since his immigration from Uzbekistan to the United States. He worked at a furniture store in New York, as a construction laborer in New Jersey; then at a warehouse, and subsequently as a clerical worker in Houston. As described above, Shavkat had two stints of employment at ARC, from 2008 to late 2009, and then from June 2011 to his arrest in early October 2012.

## DISCUSSION

## SHAVKAT SHOULD BE SENTENCED TO TERM OF TIME ALREADY SERVED

### A. *Booker* And Its Progeny

The Supreme Court held, in *United States v. Booker*, 543 U.S. 220 (2005), that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment. In its remedy opinion, the Court severed 18 U.S.C. § 3553(b)(1), which had rendered the Guidelines binding on federal sentences. This left 18 U.S.C. § 3553(a) in effect. In a series of subsequent decisions, the Supreme Court and the Second Circuit have confirmed that under the advisory Guidelines regime, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008); *see also Gall v. United States*, 552 U.S. 38 (2007).

Indeed, in *Pepper v. United States*, 562 U.S. 476 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.* at 491. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)")(quoting *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009)).

As our Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See [United States v.] Cavera*, 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93.

4

In short, it is axiomatic that, post-*Booker*, sentencing courts retain their discretion to depart or vary from the Guidelines. As this Court is undoubtedly aware, certain key principles have emerged: robotic adherence to the Guidelines has been replaced by nuanced, individualized assessment, guided by the factors set out in Section 3553(a). The touchstone is reasonableness, informed by the statutory command that a sentence should not be greater than necessary to achieve its purpose. Finally, and perhaps most critically, the Guidelines are not presumed to be reasonable, and a sentence below the Guidelines range is plainly not defective, particularly in a case like this.

### B. The Applicable Guideline is Section 2M5.1(a)(2)

Section 2M5.1 was promulgated to cover violations of the Export Administration Act, 50 U.S.C. App. § 2401 *et seq., see* U.S.S.G. App. A (Oct. 15, 1988). The case law suggests that exportation of non-military equipment falls within U.S.S.G. § 2M5.1(a)(1), providing for a base offense level of 26, *only* if the items were shipped to a foreign country that was a state sponsor of terrorism and thus subject to "national security controls." *See e.g. United States v. Elashyi*, 554 F.3d 480, 590 (5th Cir. 2008)(observing that both Syria and Libya were state sponsors of terrorism and thus national security controls applied to them); *see also United States v. McKeeve,* 131 F.3d 1 (1st Cir. 1997) (export of computer equipment to Libya); *United States v. Harb,* 111 F.3d 130 (4th Cir. 1997) (export of technological products to Iraq); *United States v. Abulfeilat,* 89 F.3d 846 (9th 1996) (selling oil from Iraq).

Indeed, in the decision cited by the government, *United States v. Min,* No. 99 Cr. 875 (KTD), 2000 WL 1576890 (S.D.N.Y. Oct. 23, 2000), the court recognized that Section 2M5.1.(a)(1) rather than (a)(2) applied, because it involved an "embargo on the shipment of goods to *North Korea* [which] is unquestionably based on national security concerns." *Id.* at *2 (emphasis added).

Accordingly, we submit that U.S.S.G. § 2M5.1(a)(2), providing for a base offense level of 14 applies, and that Shavkat's Guidelines range is 15-21 months' incarceration.

### C. Factors Warranting A Sentence of Time-Served, Or, A Substantial Downward Variance For Shavkat

There are several reasons why Shavkat should be sentenced to a term well below the Guidelines range, and indeed, we submit, one of time-served. The PSR itself summarizes considerations under the heading "**FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM.**"

> [Shavkat] [1]has no prior convictions, and [2] has a steady work history (aside from a period of unemployment between 2009 and 2011) since immigrating to the United States. [3] He is the custodial parent of his son (age 12) and receives no child support from the child's mother. [4] Additionally, he is fully involved in his daughter's (age 9) life, as

5

> an active parent. The impact the defendant's incarceration will have
> on his children may be considered a mitigating sentencing factor.

PSR, ¶ 132.

*First*, as noted in the PSR, Shavkat has no criminal history except for a dispute with Ms. Gulyamova; and he has led a productive working life while in this country. PSR, ¶¶ 84-89. This factor alone warrants a downward departure. *See e.g. United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008)(upholding downward variance, where, *inter alia*, defendant " 'led an honorable and lawful life until this point' and had no prior criminal history"); *see also United States v. Johnson*, 518 F. App'x 34 (2d Cir. 2013)("The Pre-sentence Report [ ] concluded that Johnson's total offense level was 24 and that he faced a 51–63 month sentencing range. The PSR, however, recommended a 30–month sentence because Johnson lacked a criminal history"); *United States v. Kon*, No. 04 Cr. 271(RWS), 2006 WL 3208555, at *5 (S.D.N.Y. Nov. 2, 2006)(finding that a "non-Guidelines sentence is also appropriate. Kon has no prior criminal convictions and has not been incarcerated prior to the instant offense"). As also reflected in the PSR, there are no issues with substance abuse, alcoholism, physical health or mental health. PSR, ¶¶ 102-04.

*Second*, and perhaps most importantly, the Court should consider Shavkat's extraordinary family circumstances. He is the sole support of his young son [REDACTED]. The Second Circuit has long recognized the propriety of sentencing below the Guidelines range when a term of imprisonment may "wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); *see also United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure where defendant provided substantial support for two children); *Johnson*, 964 F.2d at 129-30 (upholding departure where defendant was sole supporter of four young children), *and United States v. Alba*, 933 F.2d 117, 1122 (2d Cir. 1991) (upholding departure where defendant supported wife, two young children, and his disabled father).

In *United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004), the Second Circuit established the standard for weighing the severity of the impact of a defendant's incarceration upon a family's circumstances. Specifically, the Circuit articulated that "this factor-the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents-is a central part of the extraordinary family circumstances inquiry." *Id.* at 95. While the *Huerta* court emphasized that all families suffer when a family member is incarcerated for any length of time, that expected degree of suffering is exacerbated exponentially when no other adult in the family can effectively provide alternative means of assistance or support for the defendant's dependents. According to the Circuit, where, as here, no such reasonable alternative is available, a sentencing court can exercise its discretion under a finding of extraordinary family circumstances.

REDACTED  In this case, while the PSR states that in the event defendant is incarcerated, his mother and sister could take care of Shavkat's son ████, PSR, ¶ 96, nonetheless, it should
REDACTED  be noted that Shavkat's sister already takes care of her own children, and thus the heavy responsibility of raising ████ would fall on the shoulders of Shavkat's middle-aged mother. In such circumstances, as the PSR itself indicates, "[t]he impact the defendant's incarceration will have on his children may be considered a mitigating sentencing factor." Indeed, we submit that this case presents a classic case of extraordinary family circumstances warranting a below-Guidelines sentence. *See e.g. United States v. Marsh*, No. 10-CR-0480 (JBW), 2011 WL 5325410, at *24 (E.D.N.Y. Oct. 26, 2011)("A sentence that would require Kenneth and Nicole Marsh's son to be separated from both of his parents for a significant period would likely cause undue stress to the child. These extraordinary family circumstances are relevant to the sentencing determination… Given Ms. Marsh's history as a law abiding and productive citizen, her close ties to her family, …upon leaving prison she is likely to become an honest and productive member of society. A sentence of three months provides sufficient general and individual deterrence. It will also ensure that her young son will not be separated from both of his parents during a significant stage of his development."); *United States v. Bueno,* No. 09 Cr. 625 (HB), 2010 WL 2228570, at *3 (S.D.N.Y. Jun. 3, 2010) (significant downward variance where "[t]he [defendants'] three children were in a stable, two-parent household, with an obviously caring mother, and they will now lose both parents to significant terms of imprisonment"); *United States v. Davis,* No. 07 Cr. 727 (HB), 2008 WL 2329290, at *5 (S.D.N.Y. Jun. 5, 2008)("Any term of imprisonment would be disastrous to Mr. Davis's family. Indeed, even the Probation Office has indicated that it "believe[s] that the circumstances in this case are extraordinary," and that "[i]f the defendant is incarcerated, he will be unable to provide his children with the care and guidance that is clearly needed at this point in their lives. The negative current and future impact that even a short custodial term will have on the family unit seems too great to impose a custodial sentence in this case'"); *United States v. Hawkins,* 380 F. Supp.2d 143, 165 (E.D.N.Y. 2005), *aff'd,* 228 Fed. App'x 107 (2d Cir.2007) (concluding that any incarceration "will in effect doom her [defendant].... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment."); *Kon,* at *5-6 (S.D.N.Y. Nov. 2, 2006) (imposing non-Guidelines, non-incarceration sentence where defendant had no prior criminal history and after considering factors in 18 U.S.C. § 3553(a) and finding that incarceration would damage the defendant's children, who relied on her).

*Third,* as is evident from the letters attached hereto as Exhibit D, from his ex-wife and a former employer, Shavkat enjoys strong support; in addition, his mother and sister support him as well. Together, this network will make any future criminal activity a remote possibility. *See e.g. United States v. Bello,* No. 08 CR 801 (JBW), 2009 WL 1310791, at *2 (E.D.N.Y. May 5, 2009)("It is unlikely that Bello will engage in further criminal activity in light of his remorse, his devotion to his family, and the support that his family will provide him during his imprisonment and upon release"); *United States v. Hernandez-Castillo,* No. 05 Cr. 1033 (RWS), 2007 WL 1686686, at *5 (S.D.N.Y. Jun. 7, 2007)("Also pursuant to § 3553(a)(1), the Court takes note of the significant network of friends and family that is ready to support Hernandez-Castillo upon his release from prison").

*Fourth*, we submit that Shavkat is entitled to a two-level reduction for being a minor participant in the conspiracy, pursuant to U.S.S.G. § 3B1.2(b). It is clear from the PSR, and from the trial record, that Shavkat had a very limited period of alleged involvement in the criminal conspiracy in this case – about four weeks.

A defendant has the burden of proving by a preponderance of the evidence that he is entitled to a minor-role adjustment under U.S.S.G. § 3B1.2. *See United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002); *United States v. Castano*, 234 F.3d 111, 113 (2d Cir. 2000). As the Second Circuit has explained, a minor-role reduction "will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' ... as compared to the average participant in such a crime." *United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001) (quoting *United States v. Rahman*, 189 F.3d 88, 159 (2d Cir. 1999)); *accord United States v. Fernandez*, 312 F. Supp.2d 522, 524 (S.D.N.Y. 2004). A district court's analysis of the defendant's role in criminal activity is, accordingly, "highly fact-specific and depends on the nature of the defendant's relationship to the other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *Carpenter*, 252 F.3d at 234 (quoting *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993)).

Here, Shavkat was a shipping clerk rather than his inflated title of shipping manager. Indeed, unlike the sales people, he did not receive any commissions for the alleged illegal sales to Russia. *See e.g.*, Defendant Posobilov Trial Exhibit AP8, annexed hereto as Exhibit E. As a consequence, we submit that Shavkat's subordinate role in the conspiracy warrants a two-level reduction, pursuant to § 3B1.2.

## CONCLUSION

In sum, for the foregoing reasons, we submit that this Court should substantially depart downward. As the Supreme Court counseled in *Pepper*, "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Id., at* 492 (quoting *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000)). As the above analysis shows, Shavkat appears before this Court as a humbled individual, who is still supported by his loved ones and friends. We submit he is clearly entitled to time served.

Respectfully submitted,

Richard B. Lind

Enclosures
cc: AUSA Richard M. Tucker (w/encls.)(by ECF)
    Probation Officer Michelle Espinoza (w/ encls.)(by ECF)

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C



# EXHIBIT D

June 4, 2016

2301 Saint Francis St.
Wilmington, DE 19808

To Whom it may concern:

My ex-husband Shavkat Abdullaev has been doing extremely well since he has been in Delaware. He found employment and came to live here last year. He has been taking care of his son John and has been spending time with our daughter Alisha. Shavkat will spend time with her during his days off and she spends the night with her Dad at least a couple of time a month. He has been very helpful with Alisha by picking her up from child care and taking her to activities. I do not have family in the area so it has been nice to have his support. He is very proud of the work he is doing and has been able to secure a full time position with the company. I am happy with the progress he has made.
I have appreciated the support I have had from him with our daughter.

Best regards,

*[signature]*

Tara M. Abdullaev

2 June 2016

Leo G Pryor
Deputy Counter Intelligence
Best Buy Inc
2201 Farrand Dr.
Wilmington, DE. 19808

Re: Shavkat Abdullaev

To Whom It May Concern;

I am writing this letter of character reference on behalf of Shavkat Abdullaev, who I know as Stan. I was his direct report during his employment at Best Buy within Geek Squad. He began his employment with me four months prior as my full-time Consultant Agent. Although our time together was brief, I feel that I can attest to the character of Agent Stan as having worked side by side with him 40 hours a week for the past four months.

Shavkat (Agent Stan) quickly became a stand out, star agent. He quickly adapted to the rhythms and daily expectations of the business. Not only did he comply & conform, he excelled in every level of performance. He was a top performer and set the example of business acumen amongst his peers. He quickly gained the respect of not only those peers but from leadership as well and looked upon as having great potential for leadership candidacy.

As his direct report, I am privileged to know Agent Stan and have his contribution towards the success of the business. He was a proud ambassador of the Geek Squad brand. His dedication and work ethic was exemplified every day, which also translated to exemplary performance. I would be more than willing to speak to Shavkat's character further if need be. I can be reached at 302.993.0495 or via email at Leo.Pryor@geeksqaud.com

Regards,

*[signature]*

Leo G. Pryor
Deputy Counter Intelligence, Geek Squad
Best Buy Inc.

# EXHIBIT E

2:02 PM
10/04/15

## ARC Electronics INC.
## Employee Earnings Summary
June 1, 2011 through October 3, 2012

|  | Salary | Commissi... | TOTAL |
|---|---|---|---|
| Viktoria Klebanova | 46758.36 | 23,207.22 | 69,965.58 |
| Sevinj Taghiyeva | 50184.02 | 4,048.84 | 54,232.86 |
| Alexander Posobilov | 52672.31 | 0.00 | 52,672.31 |
| Svetlana Escobedo | 41114.98 | 11,492.09 | 52,607.07 |
| Mila Bagdikian | 37641.26 | 7,332.26 | 44,973.52 |
| Anastasia Diatlova | 35745.09 | 6,759.71 | 42,504.80 |
| Liudmila Palianskaya | 24472.48 | 1,960.70 | 26,433.18 |
| Shavkat Abdullaev | 11472.86 | 0.00 | 11,472.86 |
| Eldar E. Haybullayev | 8,450.43 | 854.30 | 9,304.73 |
| Vadims Purvins | 8,883.04 | 0.00 | 8,883.04 |
| Aiim Rakhimzhanova | 7,474.37 | 350.00 | 7,824.37 |
| Yelena Brazhkina | 2,769.24 | 437.75 | 3,206.99 |
| TOTAL | ****** | 56,442.87 | 384,081.31 |



DEFENDANT'S EXHIBIT A?8

Rec'd

00003   Page 1